_____

**SO ORDERED,**



*[signature]*

**Judge Selene D. Maddox**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**
_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**

IN RE:  **JERRY'S PLACE CLEVELAND, LLC**  **CASE NO. 25-14357-SDM**

**DEBTOR**  **CHAPTER 11**

**MEMORANDUM OPINION AND ORDER SUSTAINING UNITED STATES**
**TRUSTEE'S OBJECTION TO DESIGNATION AS A SUBCHAPTER V DEBTOR**

This matter came before the Court on the United States Trustee's Objection to Designation as a Subchapter V Debtor (the "Objection") [Dkt. #42] filed by David W. Asbach, Acting United States Trustee for Region 5 (the "UST"). Jerry's Place Cleveland, LLC (the "Debtor") filed a response opposing the Objection (the "Response") [Dkt. #55]. The Court conducted an evidentiary hearing on May 15, 2026, before proceeding to confirmation of the Debtor's proposed Subchapter V plan.

The issue before the Court is whether the Debtor may proceed under Subchapter V of Chapter 11 or whether the Debtor is excluded from Subchapter V because its primary activity is the business of owning single asset real estate. Because the Debtor's business is limited to owning and monetizing contiguous commercial property on Highway 61 North through the Delta Ag, Inc. ("Delta Ag") lease, the Lamar Companies ("Lamar") billboard arrangement, and efforts to sell the

property, the Debtor is a single asset real estate debtor within the meaning of 11 U.S.C. § 101(51B).[1] Therefore, the UST's Objection should be sustained.

## I. JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O) because it concerns the administration of the estate and the Debtor's eligibility to proceed under Subchapter V of Chapter 11. Venue is proper.

## II. BACKGROUND

On December 23, 2025, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Dkt. #1. In its petition, pursuant to Federal Rule of Bankruptcy Procedure 1020(a), the Debtor stated that it is a small business debtor as defined in § 101(51D) and elected to proceed under Subchapter V of Chapter 11. Robert Byrd was appointed as Subchapter V trustee. The Debtor has remained in possession and control of its property as debtor-in-possession.

On March 6, 2026, the UST filed the Objection. The UST asserts that the Debtor is not eligible to proceed under Subchapter V because the Debtor's primary activity is the business of owning single asset real estate. The UST alleges that the Debtor's assets consist of contiguous commercial lots located at 3612 Highway 61 North in Cleveland, Mississippi, with one lot containing a commercial building and another lot consisting of a gravel parking area. The UST further alleges that Delta Ag leases the property from the Debtor and that Lamar pays the Debtor for a billboard located on the property.

---

[1] All statutory references will be to Title 11 of the United States Code unless indicated otherwise.

The Debtor filed its Response denying that it is a single asset real estate debtor. The Debtor contends that it owns at least two separate contiguous parcels. According to the Debtor, one parcel contains the commercial building leased to Delta Ag, and another parcel contains the billboard subject to a separate arrangement with Lamar. The Debtor also asserts that its income is derived from two separate sources: the Delta Ag lease and the Lamar billboard arrangement. The Court set the Objection for hearing before proceeding to confirmation. Subchapter V eligibility is a threshold issue, and if the Debtor is not eligible to proceed under Subchapter V, the Court cannot confirm a Subchapter V plan.

The commercial property at issue is located on Highway 61 North in Cleveland, Mississippi. The deed attached to the Objection describes property in the Vance Commercial Development, including parts of Lots 4 and 5 and Lot 6. The deed of trust attached to the Objection likewise identifies the commercial real estate as collateral securing one indebtedness. The deed of trust lists the property address as 3612 Highway 61, Cleveland, Mississippi 38732. The Debtor does not dispute that the parcels are contiguous.

At the hearing, Robert Lomenick, Jr. testified regarding the Debtor's ownership structure, acquisition and use of the property, the lease with Delta Ag, the billboard arrangement with Lamar, and efforts to sell the property. Mr. Lomenick testified that he is affiliated with Hill Country Cannabis Fund, LLC, the entity that manages the Debtor. Delta Ag leases the commercial property from the Debtor, and that lease runs until 2028. At the hearing, Mr. Lomenick also testified that Delta Ag uses the commercial building and the adjoining lot in connection with its business, mainly for storage.

The property also includes a billboard arrangement with Lamar. From the pleadings and testimony, Lamar owns the billboard, pays the Debtor $2,000 per year for the sign to be located on

the Debtor's property, and that the contract ends in May 2026. The Debtor's Response states that the Debtor manages the billboard lease and intends to renew the agreement. At the hearing, Mr. Lomenick testified that the billboard arrangement was already in place when the Debtor acquired the property. He further testified that Lamar submitted a proposal regarding the billboard arrangement, including a potential sale or buyout option related to the billboard for approximately $20,000.

The Debtor's income is generated solely by the Delta Ag lease and the Lamar billboard arrangement. Mr. Lomenick also testified that the Debtor has marketed the property for sale for approximately two years. The Court admitted an exhibit at the hearing: a photograph of the property depicting the commercial building, the adjoining lot, and the billboard located on or near the adjoining parcel.[2]



At the conclusion of the hearing, the parties elected not to brief the relevant legal issues further, and the Court took the matter under advisement.

---

[2] The photograph above was admitted as a hearing exhibit to provide visual context for the property and its layout. The Court's ruling is based on the full record, including the pleadings, exhibit, testimony, and applicable law.

## III. DISCUSSION

The Debtor's eligibility turns on the interaction between Subchapter V and the Bankruptcy Code's definition of "single asset real estate." Subchapter V was enacted as part of the Small Business Reorganization Act of 2019 to provide eligible small business debtors with a more streamlined and less expensive Chapter 11 process. But Congress expressly excluded from Subchapter V a person "whose primary activity is the business of owning single asset real estate." 11 U.S.C. § 1182(1)(A).

The Bankruptcy Code defines "single asset real estate" as:

> [R]eal property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto.

11 U.S.C. § 101(51B). The Fifth Circuit has described the SARE definition as having three requirements: "(1) the debtor must have real property constituting a single property or project (other than residential real property with fewer than 4 residential units), (2) which generates substantially all of the gross income of the debtor, and (3) on which no substantial business is conducted other than the business of operating the real property and activities incidental thereto." *Ad Hoc Grp. of Timber Noteholders v. Pac. Lumber Co. (In re Scotia Pacific Co., LLC)*, 508 F.3d 214, 220 (5th Cir. 2007). All three requirements must be satisfied before a debtor is a SARE debtor. *Id*.[3] The Court addresses the burden of proof before turning to each requirement.

---

[3] Courts interpreting § 101(51B) generally recognize that the statutory definition of "single asset real estate" contains these same three requirements, all of which must be satisfied before a debtor qualifies as a SARE debtor. See e.g., *In re Merulo Maddux Properties, Inc.*, 667 F.3d 1072, 1076 (9th Cir. 2012) (recognizing that § 101(51B) defines SARE through three statutory elements); *In re Alvion Properties, Inc.*, 538 B.R. 527, 532 (Bankr. S.D. Ill. 2015) (applying the three-part framework articulated in *Scotia Pacific Co.*, 508 F.3d at 220); *In re Evergreen Site Holdings, inc.*,

**A. The Debtor bears the burden of proving Subchapter V eligibility.**

As a threshold matter, the Court must address the burden of proof. During closing argument, the Debtor emphasized that the burden allocation matters and argued that the UST, as the objecting party, possibly bore the burden of proving that the Debtor is a single asset real estate debtor. Because the burden issue affects how the Court evaluates the evidence on Subchapter V eligibility, the Court addresses that issue first.

The Bankruptcy Code and Federal Rules of Bankruptcy Procedure do not expressly state which party bears the burden when a debtor's Subchapter V designation is challenged on SARE grounds. The answer depends in part on the procedural posture. SARE status most often arises in stay-relief disputes under § 362(d)(3). In that posture, many courts place the burden on the movant seeking stay relief or seeking a SARE determination. See, e.g., *In re Alvion Props., Inc.*, 538 B.R. 527, 532 (Bankr. S.D. Ill. 2015). That rule makes sense when SARE status is part of a creditor's request for relief from the automatic stay.

But this matter is not merely a stay-relief dispute. The UST objects to the Debtor's election to proceed under Subchapter V. That distinction matters because § 1182(1)(A) makes the SARE exclusion part of the eligibility definition itself. The Debtor elected Subchapter V, seeks the benefits of Subchapter V, and is the party with access to information concerning its assets, income, business operations, and property use.

Several courts addressing this precise Subchapter V issue have placed the burden on the debtor. In *In re Evergreen Site Holdings, Inc.*, a creditor objected to the debtor's Subchapter V election on the ground that the debtor's only activity was allegedly owning SARE. 652 B.R. 307,

---

652 B.R. 307, 317 (Bankr. S.D. Ohio 2023) (same); *In re Amerinvest, LLC*, 670 B.R. 40, 46 (Bankr. E.D. Va. 2025) (same).

309 (Bankr. S.D. Ohio 2023). The court recognized that the Bankruptcy Code and Rules are silent on the burden but noted longstanding case law placing the burden on a debtor to establish eligibility for relief under a particular chapter. *Id.* at 316. The court held that the debtor bore the burden of proving by a preponderance of the evidence that it was eligible to proceed under Subchapter V. *Id.*

The Bankruptcy Court for the Southern District of Ohio followed the same approach in *In re Gate*, No. 24-10180, 2024 WL 5711045 (Bankr. S.D. Ohio May 8, 2024). There, a creditor and the UST objected to the debtor's Subchapter V election, asserting that the debtor was a SARE debtor. *Id.* at *1. The court acknowledged that courts often place the burden on the movant in stay-relief SARE disputes but distinguished that posture from a Subchapter V eligibility challenge. *Id.* at *4. The court found the majority view more persuasive and held that when SARE status is raised as part of an objection to Subchapter V eligibility, "it is the debtor that carries the burden of establishing its eligibility, including that it is a non-SARE entity, by a preponderance of the evidence." *Id.*

Although *Evergreen* and *Gate* are not controlling authority in the Fifth Circuit, the Court is persuaded by their reasoning and agrees with their analysis. Because this matter arises as an objection to the Debtor's Subchapter V designation, the Debtor bears the burden of proving its eligibility to proceed under Subchapter V. That burden includes proving that the Debtor is not excluded as a person whose primary activity is the business of owning single asset real estate.

**B. The Debtor owns real property constituting a single property or project.**

The first requirement is that the Debtor own "real property constituting a single property or project." 11 U.S.C. § 101(51B). The parties do not contend that the property is residential real property with fewer than four residential units. The dispute is whether the Debtor's contiguous parcels constitute a single property or project. Here, the Court's analysis focuses primarily on

whether the Debtor's contiguous parcels function as a single integrated commercial project within the meaning of § 101(51B).

**1. The single-project inquiry focuses on common use, plan, or purpose.**

When multiple parcels are involved, the fact that the debtor owns more than one tax parcel does not end the inquiry. Congress used the phrase "single property or project." Courts, therefore, must give meaning to both "property" and "project." Multiple parcels may constitute a single project if they are linked by a common plan, scheme, use, or purpose.

The leading multiple-parcel cases emphasize that common ownership alone is not enough. In *In re McGreals*, 201 B.R. 736 (Bankr. E.D. Pa. 1996), the debtor owned two partially adjacent parcels. One parcel contained an improved refrigerated manufacturing plant that was rented. The other parcel was raw land. *Id.* at 738. The debtor sought a determination that the properties were not SARE. *Id.* at 737. The court held that the parcels were not a single project because there was no common link in usage between them and the debtor had no plan to combine them for a unitary purpose. *Id.* at 742–43. The court explained that "the mere fact of common ownership, or even a common border, will not suffice" to make separate properties a single project. *Id.*

The Central District of California applied a similar framework in *In re Hassen Imports Partnership*, 466 B.R. 492 (Bankr. C.D. Cal. 2012). The debtor owned multiple noncontiguous parcels in different cities, acquired over time, and leased several parcels to related automobile dealership entities. *Id.* at 496–500. The City argued that the parcels were a single project because they supported an overall dealership enterprise. *Id.* at 495–96. The court rejected that argument, holding that the City failed to prove that the properties were used pursuant to a common plan or scheme. *Id.* at 508–10. In doing so, the court identified several factors relevant to the single-project inquiry: the use of the properties, the circumstances of acquisition, the location and proximity of

the properties, and any plans for future development, sale, or abandonment. *Id.* at 507. The court also emphasized that use is the "sine qua non" of the single-project determination. *Id.* at 508.

*Evergreen* applied those principles in the Subchapter V eligibility context. 652 B.R. at 309. The debtor in *Evergreen* owned two adjoining parcels in Logan, Ohio. *Id*. at 310. One parcel contained a single-family home, a pole barn, a small mobile home park, and remnants of a former zipline/adventure park operation. *Id*. at 312. The other parcel was largely vacant except for remnants of prior recreational uses. *Id*. at 310–13. The creditor argued that the parcels constituted a single project. *Id*. at 312-13. The court disagreed. It found that the parcels were not being used together in a common scheme because the mobile home park was located on one parcel, the other parcel was vacant and unused, and no common present use governed both parcels. *Id*. at 318–20. Because the debtor carried its burden to show that the parcels did not comprise a single project, the debtor was not excluded from Subchapter V on SARE grounds. *Id.* at 320–21.

The Southern District of New York reached a similar debtor-favorable result in *In re Nuovo Ciao-Di, LLC*, 650 B.R. 785 (Bankr. S.D.N.Y. 2023). There, the debtor owned two contiguous commercial condominium units in Greenwich Village. *Id.* at 786–87. Although the units shared common ownership and were conveyed under a single deed and mortgage, the court held that they did not constitute a single project. *Id.* at 790. The units had separate lot numbers, could be valued and sold independently, had unique legal characteristics, and were subject to different potential uses and sale strategies. *Id.* at 789–90. The court concluded that there was no evidence that the debtor planned to combine the properties or use them for a single purpose. *Id.*

These cases show that multiple parcels do not automatically constitute a single project. But they also show that the inquiry is practical, not formalistic. Separate parcel numbers, separate legal

descriptions, or the possibility of separate sale do not defeat SARE status if the debtor uses the property in a common plan or for a common purpose.

**2. When the debtor is a landlord, the focus is the debtor's use, not the tenant's business.**

In cases involving leased property, courts distinguish between the debtor's use of the property and the tenant's use of the property. The statute asks whether the debtor's real property constitutes a single property or project and whether substantial business is being conducted "by a debtor." 11 U.S.C. § 101(51B). The business activities of a tenant or licensee do not control the debtor's SARE status. *In re JJMM International Corp.*, 467 B.R. 275, 278 (Bankr. E.D.N.Y. 2012); *In re Gate*, No. 24-10180, 2024 WL 5711045, at *6 (Bankr. S.D. Ohio May 8, 2024).

In *JJMM International Corp.*, the debtor owned three contiguous parcels in Huntington Station, New York. 467 B.R. at 276. The parcels were leased to two non-debtor entities controlled by the debtor's principal. *Id*. One tenant operated an Asian restaurant and takeout stand, and the other operated an academic preparatory school. *Id*. The debtor argued that the case was not SARE because of the different businesses conducted on the property by its tenants and the principal's common ownership of the debtor and tenant entities. *Id*. at 277–78. The court rejected that argument. It held that the focus is not on the business activities of the tenants, but on whether the debtor treats the property as a single project or property by virtue of a common plan or purpose. *Id*. at 278. Because the debtor's common plan was to hold title to the property and lease it to the tenant entities, the court found the parcels constituted a single project. *Id*.

The same reasoning guided the court in *Gate*. The debtor in *Gate* owned the Village Gate Shopping Center on two adjoining parcels. 2024 WL 5711045, at *1-2. The property included a main shopping center building, a recording studio, a former service station used as an automotive repair garage, and a former bowling alley being renovated for possible use as an event center. *Id*.

The debtor argued that the separate uses, separate county use codes, ability to sell certain buildings separately, and potential future event-center arrangement showed that the property was not SARE. *Id.* at *5–8. The court disagreed. Relying on *JJMM*, the court held that the relevant question was not the variety of tenant uses, but whether the debtor treated the property as a single project by virtue of a common plan or purpose. *Id.* at *6. Because the debtor purchased the parcels together to lease commercial buildings to tenants, the court found the two parcels were part of a common plan and constituted a single project. *Id.*

*In re Amerinvest, LLC*, 670 B.R. 40 (Bankr. E.D. Va. 2025), is also instructive. There, the debtor owned three adjacent parcels in Alexandria, Virginia. *Id.* at 43. The properties included multiple rental spaces, a restaurant, parking, and other commercial uses. *Id*. The debtor argued that the parcels were separate and should not be treated as a single project. *Id.* at 45. The court held otherwise. It emphasized that, when property is leased, the focus is on the debtor's common plan or purpose, not the tenant's business activities. *Id.* at 47. The court found the parcels were all used in the debtor's common plan to act as a commercial landlord, were generally treated as one economic unit, and were adjacent to one another. *Id.* at 47-48. The debtor was therefore a SARE debtor and could not proceed under Subchapter V. *Id.* at 48.

Mississippi authority is consistent with that approach. In *In re Livingston Township Fund One, LLC*, the debtor owned a commercial planned development at the junction of Highway 463 and Highway 22 in Flora, Mississippi. No. 23-02573-JAW, slip op. at 2 (Bankr. S.D. Miss. Jan. 2, 2024). The debtor purchased twenty-five acres by a single deed and built roads, utilities, streetlights, and commercial buildings on the property. *Id*. The debtor leased commercial space to various tenants, including restaurants, retail stores, a bar, and other businesses. *Id*. at 3. The debtor

argued that its property should not be treated as SARE, in part because of the nature and variety of the development. *Id*. at 8.

The court found that the development was a single project and that the debtor's revenues consisted solely of rental income. *Id*. at 10-12. The court further held that the debtor was a SARE debtor and therefore could not reorganize under Subchapter V. *Id*. at 12. Although *Livingston* is an unreported decision and therefore not binding on this Court, it is especially persuasive because it involved a Mississippi commercial development, multiple tenants, Subchapter V eligibility, and the same statutory exclusion at issue here.

**3. The Debtor's contiguous commercial parcels constitute one project.**

Applying those authorities, the Debtor's property constitutes a single commercial real estate project. The parcels are contiguous. They are located at the same commercial site on Highway 61 North in Cleveland, Mississippi. They were acquired together by deed and encumbered together by a deed of trust. Delta Ag uses both the commercial building and the adjoining lot in connection with its business. The billboard is located on the adjoining parcel. The Debtor has marketed the property for sale for approximately two years.

The Debtor emphasizes that the property may have separate tax parcel numbers and separate income arrangements. But *McGreals*, *Hassen*, *Evergreen*, and *Nuovo Ciao-Di* do not stand for the proposition that separate parcel numbers defeat SARE status. Those decisions recognize that courts must look for a common plan, use, or purpose. Here, the common purpose is the Debtor's ownership and monetization of the commercial site through leases, site agreements, and sale efforts.

The Debtor's reliance on the billboard parcel does not defeat the first requirement. The billboard is located on the Debtor's commercial property and produces income because of that

location. The fact that Lamar uses the billboard for advertising purposes does not transform the billboard area into a separate project for SARE purposes. As *JJMM*, *Gate*, and *Amerinvest* explain, the Court focuses on the Debtor's use of the property, not the business of the tenant or licensee. The Debtor's use is to own and lease or otherwise monetize the commercial real property. The first requirement is therefore satisfied.

**C. The Debtor's real property generates substantially all the Debtor's gross income.**

The second requirement is that the real property generate substantially all the Debtor's gross income. 11 U.S.C. § 101(51B). This element focuses on the source and character of the debtor's revenue. Courts ask whether the debtor's income is generated by the property itself, such as through rent or site-use payments, or whether income is generated by labor, management services, goods, or an operating business. See *In re Gates*, 2024 WL 5711045, at *6 (citing *JJMM, Int'l Corp.,* 467 B.R. at 277; *In re Club Golf Partners, L.P.*, No. 07-40096-BTR-11, 2007 WL 1176010, at *5 (E.D. Tex. Feb. 15, 2007)).

The Fifth Circuit addressed this distinction in *Scotia Pacific*. There, the debtor owned approximately 200,000 acres of timberland and held contractual rights to harvest timber on additional land. *Scotia Pacific*, 508 F.3d at 216–17. The noteholders argued that the debtor was a SARE debtor because the debtor's income came from timberland. *Id.* at 218. The Fifth Circuit rejected that argument, focusing on the nature of the debtor's operations. *Id*. at 220-21. The debtor employed more than sixty employees, including scientists within its forestry program, performed timberland analysis and inventory, developed and implemented timber harvesting plans, ensured regulatory compliance, planned and maintained roads, and sold timber. *Id.* at 218, 224–25. The court held that the debtor's timberland was "more than a passive investment" and that the debtor conducted substantial business beyond merely operating real property. *Id.* at 224–25.

Page 13 of 20

*Gate* applied the same active-versus-passive distinction in the Subchapter V context. There, the debtor's only historical income had been rental income from shopping center tenants. *Gate*, 2024 WL 5711045, at \*7. The debtor argued that a recent joint venture agreement with a tenant to operate a future event center would produce profit-sharing income rather than rent. *Id.* The court found that the joint venture agreement had not been admitted, the renovations were incomplete, and the debtor provided no timeline for completion or operation. *Id.* The court concluded that the potential for a different form of income in the future was too speculative to affect the analysis and held that substantially all of the debtor's income was generated through rental income. *Id.*

Here, the Debtor's income comes from two sources: the Delta Ag lease and the Lamar billboard arrangement. Both are generated by the Debtor's real property. The Delta Ag income is rent for the use of the commercial property while the Lamar income is compensation paid because the billboard is located on the Debtor's property. The Debtor has not identified income from the sale of goods, services, inventory, management services, advertising services, or any business operation independent of the real property.

The Debtor argues that Delta Ag and Lamar are separate income sources. But the statute does not ask whether the debtor receives one check or multiple checks. A shopping center may receive rent from many tenants and still receive substantially all its income from real property. An office building, apartment complex, or commercial development may have multiple leases and still be SARE. The question is whether the income is property-derived or business-operation-derived.

The possible Lamar sale or buyout proposal does not change the second requirement. Mr. Lomenick testified that Lamar submitted a proposal related to renewal of the billboard arrangement and that the proposal included a possible sale or buyout option for approximately $20,000. That proposal may represent value to the estate. But the value arises from the Debtor's property-related

rights connected to the billboard site. It is not income from a separate operating business. Even if the Debtor accepts the proposal, the resulting payment would be generated by the Debtor's ownership and monetization of the property or rights incidental to the property. The second requirement is thus satisfied.

**D. The Debtor conducts no substantial business other than operating the real property and activities incidental thereto.**

The third requirement is that no substantial business be conducted by the debtor other than the business of operating the real property and activities incidental thereto. 11 U.S.C. § 101(51B). This requirement is the most disputed in this case because of the Lamar billboard arrangement and the potential $20,000 proposal.

**1. Courts distinguish passive real estate activity from an operating business.**

The relevant case law draws a practical line between passive real estate activity and an operating business. On one side are debtors whose activities consist of owning, leasing, maintaining, repairing, improving, marketing, selling, or otherwise monetizing real property. Those activities are intrinsic or incidental to operating real property. On the other side are debtors using real property as the platform for a separate operating business that generates income through labor, services, goods, or active enterprise.

The active-business cases illustrate what is required to move a debtor outside the SARE definition. In *Scotia Pacific*, the Fifth Circuit held that the debtor was not SARE because it was not simply holding timberland for passive income. 508 F.3d at 224-25. The debtor had employees, used contractors, managed timber harvest plans, performed environmental and regulatory work, maintained roads, and sold timber. *Scotia Pacific*, 508 F.3d at 217, 224–25. The court concluded that the debtor's income-producing activity extended beyond the sale or lease of the underlying land. *Id.* at 224–25.

In *In re Kkemko, Inc.*, 181 B.R. 47 (Bankr. S.D. Ohio 1995), the debtor operated a marina. The mortgagee argued that the marina was SARE. *Id.* at 48–49. The court disagreed because the marina was a business, not merely real estate held for income. *Id.* at 50–51. The debtor did more than rent moorings. It stored, repaired, and winterized boats, provided showers and a pool, sold gas, and provided concessions. *Id.* at 51. Those services constituted substantial business activity beyond operating the real property. *Id.*

Similarly, in *In re Club Golf Partners, L.P.*, 2007 WL 1176010 (E.D. Tex. Feb. 15, 2007), the debtor owned and operated a golf club. The property included an eighteen-hole golf course, driving range, tennis courts, clubhouse, restaurant, and bar. *Id.* at *1. The debtor sold memberships, charged green fees, rented golf carts, charged for use of the driving range and tennis courts, sold merchandise, sold food and beverages, hosted special events, and conducted golf tournaments and lessons. *Id.* The court found that the debtor's revenue was generated by active business operations and workers' labor, not merely by passive ownership or leasing of real property. *Id.* at *5–6.

A more recent example is *In re Chen Foundation, Inc.*, 661 B.R. 34 (Bankr. S.D.N.Y. 2024). In that case, the debtor owned a multi-story building that included commercial rental space, a cultural center, and an art gallery. *Id.* at 36–37. The secured lenders sought a SARE determination. *Id.* at 36. The court denied the motion, finding that the debtor's art gallery and cultural center activities were not intrinsic to merely owning or developing the real estate. *Id.* at 38–39. The debtor and its affiliates regularly held pop-up events and special showings of artwork at the property, and the record did not show that the gallery and cultural activities were passive or merely incidental to real estate ownership. *Id.* at 39.

**2. Activities intrinsic to owning, leasing, improving, marketing, or selling real property are incidental.**

By contrast, courts routinely hold that activities intrinsic to owning, leasing, improving, marketing, or selling real property do not constitute substantial business separate from the real property. In *In re Kara Homes, Inc.*, 363 B.R. 399 (Bankr. D.N.J. 2007), multiple affiliated debtors owned separate real estate development projects for single-family homes and condominiums. *Id.* at 400–01. The debtors argued that they were not SARE because they were involved in land acquisition, community planning, home marketing, and property maintenance. *Id.* at 405–06. The court rejected that argument, holding that those activities were intrinsic to owning and developing real estate and were incidental to the operation of the subject tracts. *Id.* at 406. The court explained that a SARE case is one in which the debtor performs functions intrinsic to owning and developing real estate, not one in which the debtor generates income from activities unrelated to real estate. *Id.*

*Gate* provides a particularly useful comparison. The debtor there argued that renovations and a future event-center profit-sharing arrangement took the case outside the SARE definition. *Gate*, 2024 WL 5711045, at *7–8. The court held that roof repairs, renovations, and making unrentable space rentable were incidental to owning and leasing property. *Id.* at *8. The court also held that the future event-center arrangement was too vague and speculative to constitute substantial business activity. *Id.* The debtor had no employees generating income for the business, and its main business activity remained collecting rent from tenants. *Id.* The same distinction applies here. The Debtor leases commercial property to Delta Ag. It receives compensation from Lamar because a billboard is located on the property. It manages or considers renewal of the Lamar arrangement. It has marketed the property for sale. These activities relate to the ownership, leasing, management, and monetization of the Debtor's real property.

**3. The Lamar billboard arrangement is a property-related right, not a separate advertising business.**

The Lamar billboard arrangement deserves separate discussion. The Debtor argues that the billboard arrangement and the possible $20,000 proposal show activity beyond passive real estate ownership. The Court disagrees.

The relevant distinction is between Lamar's business and the Debtor's business. Lamar is the outdoor advertising company. The Debtor is the property owner. Lamar uses the location for advertising purposes and pays the Debtor because the billboard is located on the Debtor's property. The record does not show that the Debtor sells advertising space, solicits advertisers, services advertising customers, maintains advertising accounts, employs workers in an advertising operation, or operates a billboard advertising business. The record shows that the Debtor receives or may receive compensation for a property-related right.

The possible $20,000 proposal does not alter that conclusion. A contract right associated with real property may have value to the estate. But value alone is not the statutory test. The statutory test is whether substantial business is conducted by the Debtor other than operating the real property and activities incidental thereto. Managing, renewing, assigning, selling, or monetizing a billboard lease, license, easement, site agreement, or related contract right is incidental to owning and operating the real property on which the billboard is located. It does not transform the Debtor into an advertising company.

This conclusion is consistent with *Kara Homes* and *Gate*. In *Kara Homes*, marketing and selling homes did not remove the debtor from SARE because those activities were intrinsic to the real estate business. *Kara Homes*, 363 B.R. at 405–06. In *Gate*, a possible future profit-sharing arrangement tied to use of the property did not remove the debtor from SARE because the debtor's actual business remained owning and leasing the property. *Gate*, 2024 WL 5711045, at *7–8. Here,

the Lamar proposal may generate value, but it remains tied to the Debtor's ownership and use of the site.

### 4. Delta Ag's business activity is not the Debtor's business activity.

Delta Ag's business activity also does not change the analysis. Delta Ag may sell, store, repair, or maintain equipment on the property. But Delta Ag is not the Debtor. The SARE statute asks whether "substantial business is being conducted by a debtor" other than operating the real property and incidental activities. 11 U.S.C. § 101(51B).

As *JJMM*, *Gate*, and *Amerinvest* explain, the business activities of tenants do not control the SARE inquiry. The focus remains on the Debtor's activity. The Debtor's activity is owning, leasing, managing, marketing, and monetizing rights associated with the real property. That is not substantial business activity separate from operating the real property. Accordingly, the third requirement is satisfied.

### E. The Debtor is excluded from Subchapter V.

All three requirements of § 101(51B) are satisfied. The Debtor owns real property constituting a single commercial real estate project. The property generates substantially all of the Debtor's gross income. The Debtor conducts no substantial business other than operating that real property and activities incidental thereto.

Because the Debtor's primary activity is the business of owning single asset real estate, § 1182(1)(A) excludes the Debtor from Subchapter V. The Debtor's Subchapter V designation is therefore improper. This ruling, however, does not dismiss the case. It determines only that the Debtor may not proceed under Subchapter V. The case may proceed, if at all, as a non-Subchapter V Chapter 11 case unless otherwise ordered by the Court.

### IV. CONCLUSION

The Debtor owns and monetizes a single commercial real estate project on Highway 61 North in Cleveland, Mississippi. Its income is generated by the Delta Ag lease and the Lamar billboard arrangement. The record fails to show that the Debtor operates Delta Ag's business, Lamar's advertising business, or any other business separate from owning, leasing, managing, marketing, and monetizing rights associated with the property. The Lamar billboard arrangement, including any potential sale or buyout option, may be an asset of value to the estate. But it remains a property-related right arising from the Debtor's ownership and operation of the real property. It does not constitute substantial business activity separate from the operation of the real property.

Accordingly, it is **ORDERED, ADJUDGED, AND DECREED** that the United States Trustee's Objection to Designation as a Subchapter V Debtor [Dkt. #42] is **SUSTAINED**.

It is further **ORDERED** that Jerry's Place Cleveland, LLC is a single asset real estate debtor within the meaning of 11 U.S.C. § 101(51B).

It is further **ORDERED** that Jerry's Place Cleveland, LLC is not eligible to proceed under Subchapter V of Chapter 11.

It is further **ORDERED** that, pursuant to Federal Rule of Bankruptcy Procedure 1020(a), the Debtor's statement that it is a small business debtor eligible to proceed under Subchapter V of Chapter 11 is incorrect; the Debtor's Subchapter V designation is stricken; and this case shall proceed, if at all, as a non-Subchapter V Chapter 11 case unless otherwise ordered by the Court.

##END OF ORDER##